**In re MACHNE MENACHEM, INC.,
Debtor–in–Possession.**

**Bankruptcy No. 5–01–BK–04926.**

United States Bankruptcy Court,
M.D. Pennsylvania.

Sept. 6, 2006.

Opinion Denying Clarification and/or
Reconsideration Dec. 29, 2006.

Stephen G. Bresset, Bresset & Santora, LLC, Honesdale, PA, for Debtor–in–Possession.

## OPINION

JOHN J. THOMAS, Bankruptcy Judge.

Before the Court is Yaakov Spritzer's[1] Second Amended Plan which has been sub-

---

1. Yaakov Spritzer was one of the original Board of Directors who, after an arduous legal battle in the United States District Court for the Eastern District of New York, was removed from the Board of Directors, but not before putting the corporation into Chapter 11 bankruptcy on December 6, 2001. For a detailed discussion of the parties legal history, see *Machne Menachem, Inc. v. Hershkop*, 2003 WL 1193528 (W.D.N.Y. January 31, 2003); *Machne Menachem, Inc. v. Hershkop*, 237 F.Supp.2d 227 (E.D.N.Y 2002); *Machne Me-*

sequently modified. The Debtor–in–Possession[2] has raised four primary objections to the plan including nonconformance with: 1) 11 U.S.C. § 1129(a)(16) by violating applicable New York non-profit law; 2)11 U.S.C. § 1129(a)(3) because it was not proposed in good faith; 3) 11 U.S.C. § 1129(a)(3) because confirmation would ignore and violate New York non-profit law; and 4) 11 U.S.C. § 1129(a)(11) claiming the plan is not feasible. See Doc. No. 475. For the following reasons, the Court will overrule the Debtor's objections and confirm the plan contingent on Spritzer meeting certain conditions further elucidated below.

### 1.) Does the Plan Violate 11 U.S.C. § 1129(a)(16)?

Section 1129(a)(16) reads in pertinent part:

All transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

11 U.S.C. 1129(a)(16)[3]

The sections of the New York Not–for–Profit Corporation Law (N–PCL) at issue in this case are § 509 and § 510. N–PCL §§ 509, 510 (McKinney's 005).

Section 509 reads:

Purchase, Sale, Mortgage and Lease of Real Property. No Purchase of real property shall be made by a corporation and no corporation shall sell, mortgage or lease real property unless authorized by the vote of two-thirds of the entire board, provided that if there are 21 or more directors, a vote of the majority of the entire board shall be sufficient.

N–PCL § 509 (McKinney's 2005)

The pertinent parts of Section 510 of New York Not-for Profit Law is as follows:

Disposition of all or substantially all assets. (a) A sale, lease, exchange or other disposition of all, or substantially all, the assets of a corporation may be made upon such terms and conditions and for such consideration which may consist in whole or in part of cash or other property, real or personal, including shares, bonds or other securities of any other domestic or foreign corporation or corporations of any type or kind, as may be authorized in accordance with the following procedure:

(2) If there are no members entitled to vote thereon, such sale, lease, exchange or other disposition shall be authorized by a vote of at least two-thirds of the entire board; (3) if the corporation is, or would be if formed under this chapter, classified as a Type B or Type C corporation under § 201 (purposes), such sale, lease exchange or other disposition shall in addition require leave of the Supreme Court in the judicial district or of the county court of the county in which the corporation has its office or principal

---

nachem, Inc. v. Hershkop, 1999 WL 438471 (E.D.N.Y. May 12 1999); and Machne Menachem, Inc. v. Hershkop, 1998 WL 564541 (E.D.N.Y. July 17, 1998).

**2.** Debtor is Machne Menachem, Inc., a non-profit corporation formed and governed under the laws of New York. Debtor owns and operates a religious summer camp, located in Lackawaxen, Pike County, Pennsylvania, for Hasidic Jewish male children. For a more detailed discussion of the formation and earlier tribulations of this case, see the Court's former Opinion at In re Machne Menachem, 304 B.R. 140 (Bankr.M.D.Pa.2003).

**3.** This Section was added to the Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA") and is applicable to cases which were pending on the date of the enactment. HR Rep. No. 31, 109th Cong., 1st Sess. 1221 (2005).

place of carrying out the purposes for which it was formed.[4]

N–PCL § 510 (McKinney's 2005)

Debtor is a Type B not-for-profit corporation under New York law. Debtor contends that, as a Type B corporation, it cannot have its assets sold, transferred, or "otherwise disposed of" without either the two-thirds vote of the Board of Directors, or leave of the appropriate state court.

Spritzer argues that the aforementioned New York Not–for–Profit §§ 509 and 510 only apply to *voluntary* transfers by the company. He advances that nothing in New York Not–for–Profit Law precludes a creditor from seeking to sell the assets of a not-for-profit pursuant to a plan of reorganization proposed by a creditor (an involuntary transaction). As a parallel example, he cites the situation where a not-for-profit's assets can be sold without a vote at a foreclosure sale.[5] According to Spritzer's logic, the transfer of corporate assets pursuant to a creditor's plan of reorganization would be an involuntary transfer of assets, similar to a foreclosure, and not governed by either N–PCL § 509 or § 510. Since Spritzer's plan calls for an involuntary transfer of corporate property, no vote of members would be necessary

and his plan would not be contrary to New York Not–for–Profit Law.

Ultimately, the issue boils down to whether Spritzer's plan proposes a transfer governed by N–PCL §§ 509 and 510. This issue requires the determination of two things; first, is Spritzer's transfer voluntary or involuntary; and second, if it is an involuntary transfer, does § 509 and § 510 apply to involuntary transfers.

**A) Does the plan contemplate an involuntary transfer?**

 The pertinent plan provisions at issue are as follows:

**5.3** *Sale of Debtor's Property.* The Bankruptcy Court's entry of the Confirmation Order shall constitute approval of the sale and transfer to New Entity on the Confirmation Date of all of the Debtor's right, title, and interest in and to the Debtor's (and its estate's) personal property (tangible and intangible, including all claims and causes of action) and real property (including real estate, improvements thereon, and fixtures).

(a) *Execution of Documents.* Pursuant to Section 1142 of the Bankruptcy Code, the Debtor is directed, within two busi-

4. Section 201 of the Not–for–Profit Corporation Law defines a Type B as a not-for-profit corporation for charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals.

5. It should be noted that the cases cited by Spritzer do not support his contention that foreclosure sales of non-profit property do not require majority votes and cite as authority for this proposition the case of *Adult Home at Erie Station, Inc. v. Assessor and Board of Assessment Review of the City of Middletown,* 8 Misc.3d 1010, 801 N.Y.S.2d 776, 2005 WL 1552847 at *1 (2005). However, that case has nothing to do with the instant quandary and centers around whether a not-for-profit adult home qualified for a tax exemption. The only connection between this case and the case cited is that *Adult Home at Erie*

*Station, Inc.,* involved a not-for-profit corporation purchasing a home at a foreclosure sale. There is no mention in the case that a not-for-profit corporation was the owner of the property prior to the foreclosure. At issue here is not whether a not-for-profit corporation can buy property, but rather what the appropriate corporate procedure is when a not-for-profit corporation's property is being involuntarily transferred. The second case they reference, *Tenants for Justice v. Hills,* 413 F.Supp. 389, 390 (E.D.Pa.1975), involves a home which originally belonged to a not-for-profit corporation which was foreclosed upon, it does not discuss the circumstances of the foreclosure and whether there was a vote prior to the involuntary transfer of that property.

ness days after the Confirmation Date, to execute a Bill of Sale, transfer of Certificates of Title, and a Quitclaim Deed in favor of New Entity. If the Debtor fails or refuses to execute the Bill of Sale, transfer of Certificates of Title, Deed after the Confirmation Date, the Proponent is authorized and empowered, without further court order, to execute such documents on behalf of the Debtor and to execute all instruments and to do all acts and things with respect to the purchased assets which New Entity shall deem necessary or desirable to more effectively convey or transfer to, and vest in, New Entity the purchased assets.

Using the text to determine the economic reality of the transaction, this is not a voluntary transfer of Debtor's assets. Carrying out this provision of the plan would require the current board of directors to sign over the Debtor's property to this new entity, and as evidenced by the tangled history of litigation between the parties, that will be an involuntary action on the part of the current directors.

### B) Is an Involuntary Transfer Within the Gambit of N–PCL §§ 509, 510?

█ Having established that the plan contemplates an involuntary transfer of the Debtor's assets to a new corporation, the issue becomes whether N–PCL § 509 and § 510 prohibit an involuntary transfer of Debtor's assets. The statutory language of N–PCL § 510(a) states the section applies to "a sale, lease, exchange or other disposition of all or substantially all, of the assets of a corporation...." This Court has found no New York authority regarding whether an involuntary transfer

pursuant to a bankruptcy plan falls within the language "other disposition."

One way to interpret the law is to read the phrase "other disposition" as encompassing involuntary transfers of corporate property. To read the statute in such a manner would lead to an absurd result. If the court were to find involuntary transfers of property were governed by the procedures as set forth in N–PCL § 509 and § 510, that would mean creditors could not foreclose on a not-for-profit's property without a two-thirds majority vote from the board of directors first. Logically speaking, it would be inapposite for a board of directors to vote in favor of a bank foreclosing on corporate property. This is especially true when the result of a two-thirds vote not to let the creditor foreclose would preclude that creditor from foreclosing. It is this Court's position that if New York's highest court were presented with this quandary, they would agree with this interpretation of N–PCL. §§ 509 and 510.[6]

In sum, because Spritzer's plan contemplates an involuntary transfer of corporate assets, and this involuntary transfer need not comply with either the provisions of N–PCL § 509 nor § 510, the Court finds the plan not in contravention of New York Not–for–Profit Law.

### 2.) Does the Plan Violate § 1129(a)(3) Good Faith Requirement?

█ Section 1129(a)(3) requires the bankruptcy court to find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The code does not define the term "good faith" but the Third Circuit

---

**6.** "Where a state's highest court has not squarely addressed an issue, we must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *Cooper Distributing Co.,*

*Inc. v. Amana Refrigeration, Inc.,* 63 F.3d 262, 275 (3d Cir.1995), citing *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.), *cert denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

has found that "for purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the bankruptcy code." *In re Combustion Engineering, Inc.,* 391 F.3d 190, 247 (3d Cir.2004) (citing *In re PWS Holding Corp.,* 228 F.3d 224, 242 (3d Cir. 2000)) (citing *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 150 n. 5 (3d Cir.1986)). "A good faith determination must be a fact-intensive, case-by-case inquiry." *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir.2003).

## A) Bad Faith to Use Bankruptcy as an End–Round of Other Judicial Proceedings

██ Debtor argues that this Court may consider a *debtor's*[7] pre-filing conduct, as well as the feasability of the plan itself in the context of a § 1129(a)(3) determination and cites as authority for this proposition, *In re Madison Hotel Associates,* 29 B.R. 1003, 1009 (W.D.Wis.1983). Unfortunately, *Madison Hotel* was appealed to the Seventh Circuit, which chastised the district court on this exact point, holding the district court erroneously construed the § 1129(a)(3) good faith requirement for proposing a plan to be equivalent to the good faith that is a prerequisite to filing a chapter 11. *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984). The Seventh Circuit continued to find that the immediate circumstances surrounding the plan should be the court's guiding light. See *Id.* Other courts have since agreed, holding that "[t]he evaluation of good faith is not based on the plan proponents' be-

havior prior to the filing of the bankruptcy petition … but instead, in light of the totality of the circumstances surrounding confirmation." (internal quotation marks omitted) *In re Cellular Information Systems, Inc.,* 171 B.R. 926, 945 (Bankr. S.D.N.Y.1994) (citing *In re General Homes Corp.,* 134 B.R. 853, 862 (Bankr.S.D.Tex. 1991) and *In re Jandous Elec. Constr. Corp.,* 115 B.R. 46, 52 (Bankr.S.D.N.Y. 1990)). Although this Court is well aware of the scathing opinion by Judge Glasser[8] concerning Spritzer's pre-petition corporate law violations, that conduct may not be a factor in determining whether this plan is proposed in good faith. Again, the good faith requirement of a § 1129(a)(3) inquiry pivots on the plan itself. *In re Combustion Engineering, Inc.,* 391 F.3d 190 at 247 [citing *In re PWS Holding Corp.,* 228 F.3d 224 at 242 (citing *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 n. 5) ].

██ Looking primarily at the parameters of Spritzer's plan, does the plan itself achieve a result consistent with the objectives and purposes of the bankruptcy code? *In re Combustion Engineering, Inc.,* 391 F.3d 190 at 247. Here, Spritzer's objective is to regain control of the camp property and to run the camp as he sees fit, something he would likely be unable to do without help from the bankruptcy code. That being said, "Courts have construed section 1129(a)(3) broadly, and have generally rejected allegations that good faith is lacking when the debtor's purpose in filing a chapter 11 case is to obtain a benefit or result inside of bankruptcy not contemplated outside of bankruptcy." *Collier on*

---

7. The term debtor is demarcated in this case because of the atypical circumstances herein whereby the pre-petition Debtor was controlled by the proponent, and the post-petition Debtor has been controlled by a different set of individuals. The Debtor asks the Court to look at the proponent's conduct while he was in control of the Debtor pre-petition.

8. *Machne Menachem, Inc. v. Hershkop,* 2003 WL 1193528 (E.D.N.Y. January 31, 2003).

*Bankruptcy* ¶ 1129.03[3][a], [citing *Plati-num Capital v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1076 (9th Cir.2002), *cert. denied* 538 U.S. 1035, 123 S.Ct. 2097, 155 L.Ed.2d 1065 (2003), and *Solow v. PPI Enterprises (U.S.) (In re PPI Enterprises (U.S.))*, 324 F.3d 197, 211 (3d Cir.2003) ]. Using similar reasoning, it would seem that if a debtor could file a bankruptcy with the intention of using the unique laws of bankruptcy to achieve something the debtor otherwise would not be able to do, then a creditor could like-wise take advantage of bankruptcy laws to achieve something he would not necessari-ly be able to achieve outside the context of bankruptcy. Pursuant to that reasoning, the Court finds the sole fact that Spritzer would not be able to achieve this result outside the context of bankruptcy does not *per se* make his plan a bad faith plan, so long as it is not inconsistent with the bank-ruptcy code.

## B) Bad Faith for Creditor to Absolve Himself from Future Liability to Debtor via a Bankruptcy Plan Which Absorbs All Claims of Debt-or

▆ Debtor currently has two adver-sary proceedings pending in this Court against Spritzer. *Machne Menachem Inc. v. Meri Schriber and Yaakov Spritzer (In re Machne Menachem)* 5:03–ap–50211 (Complaint seeking $83,142.50 in damages for civil conversion of corporate assets); and *Machne Menachem, Inc. v. Yaakov Spritzer (In re Machne Menachem)*, 5:03–ap–50313 (to avoid a preferential transfer of a one million dollar mortgage). Debtor has also objected to the proof of claims filed by Spritzer and his related entities. See, e.g., Doc. Nos. 365, 366. As shown above, Section 5.3 of Spritzer's Second Amended Plan includes a transfer of all

Debtor's claims and causes of action to the new entity governed by Spritzer. After the Court's comments expressing reserva-tions with regard to this aspect of the plan, which comments were made at the plan confirmation hearing, Spritzer offered two alternative modifications to his plan to avoid running afoul of the good faith re-quirement.

### i) Exhibit A: Spritzer's First Alternative to Avoid Bad Faith

In a brief filed after the confirmation hearing, Spritzer offered to modify his plan so he would not acquire the Debtor's bank accounts, claims, or other intangible personal property. (See Doc. 490 at 5, and Exhibit A). Following this idea through, and assuming that the Debtor prevailed on its claims against Spritzer that his one million dollar mortgage on the property is a voidable preference, the result would be a windfall to Summer Recreation (Sprit-zer's new not-for-profit entity) which is purchasing the property at a valuation off-set by the one million dollar Spritzer mort-gage. Foreseeing that the Court may be unsatisfied with this amendment, Spritzer also offered a second alternative modifica-tion to the plan to account for this possible apple of discord.

### ii) Exhibit C: Spritzer's Second Alternative to Avoid Bad Faith

Alternatively, Spritzer offered to modify the plan, as follows: "if the Debtor were to prosecute and prevail on its objections to the Proponent's (Spritzer) claims ... then the Debtor would have a claim against Summer Recreation to the extent that the claim objections resulted in there being any "equity" in the property transferred to Summer Recreation." (*Id.* at 6 *see also*

Exhibit C[9]). If the Court were to adopt Spritzer's Exhibit C amendments, it would allow for two remaining entities.

Spritzer's new not-for-profit, Summer Recreation, would own all of Debtor's assets except its bank account and its general intangibles. Summer Recreation would have acquired assets that the Court finds are valued at $1,375,250 ($1,225,000 in real estate and $150,250 in personalty). This new entity would also have assumed the Debtor's potential liabilities of approximately $1,931,191.31. In sum, Spritzer's entity would be starting out in the red with an approximate deficit of half a million dollars.

The second entity would be the Debtor which would have accounts, general intangibles, and the right to recover from Summer Recreation the benefit of "the 'equity' in real and tangible personal property transferred to Summer Recreation under the Plan as compared to the actual total of allowed claims paid by the Proponent and/or assumed by Summer Recreation." Doc. No. 490 at 8.

Looking at the plan as modified, the question remains is this plan proposed in good faith? Assuming the plan plays out as projected, Spritzer will assume liability for or pay off all Debtor's current creditors, procure the real estate, and ultimately run a camp for Jewish children, which the parties agree was the original intention of the Debtor. Similarly, the Debtor ends up with all its liability being transferred to a new entity and retaining a potential to recover the fair market value of the property less the mortgages and the allowed claims of creditors. The only party here in danger of sinking into liquidation is Summer Recreation which is starting out its not-for-profit life in debt. This plan appears to be proposed in good faith, but, the issue of feasibility must still be addressed prior to the plan being confirmed.

### 3.) Feasibility of the Plan & 11 U.S.C. § 1129(a)(11)

■■■■ Debtor asserts the plan is not feasible under 11 U.S.C. § 1129(a)(11) which requires: "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The standards needed to achieve plan feasibility are not rigorous. *In re Mayer Pollock Steel Corporation,* 174 B.R. 414, 421 (Bankr.E.D.Pa.1994). "The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *In re Prussia Associates,* 322 B.R. 572, 584 (Bankr.E.D.Pa.2005) [citing 7 Collier on Bankruptcy, ¶ 1129.03[11] (Matthew Bender 15th Ed. Revised) (footnotes omitted.) ]. In most cases, feasibility centers around the continuing viability of the debtor's business.[10] In light of the fact Spritzer's

---

**9.** The proposed order advocates adding the following subsection to the plan:

"(b) *Valuation and Consideration for the Transfer of Debtor's Property:* To the extent, if any, that the Debtor establishes that the value of the Debtor's real and tangible personal property transferred to the New Entity under this Plan, as such value is determined by a final Court order in connection with confirmation of the Plan, is more than the consideration (including, without limitation, the assumption of all Allowed Claims) provided by New Entity in exchange for those assets, the Debtor shall have a claim against the New Entity for such Difference." (Doc. No. 490, Exhibit C, at 5.)

**10.** When determining a plan's feasibility the court will look to the following factors: "(1) the adequacy of the debtor's capital structure;

plan leaves the Debtor with no continuing business. (only funds and the ability to litigate pending actions), the Court finds the usual feasibility factors inapplicable to the instant case.

The Court has one remaining concern with regard to the confirmation of Spritzer's plan. Assuming arguendo that the Debtor is successful in its objection to the million dollar Spritzer mortgage claim, etc., the fund created by the purchase price should vest in the Debtor to some significant degree. There is no guarantee that Summer Recreation will have the funds to address this issue as provided by the modified plan.

■ 11 U.S.C. § 1129(b)(2)(C)(i) requires that a plan provide that every class of interest, including stockholders, receive the "value of such interest." Admittedly, it is a rare corporate Chapter 11 that has no stockholders, as is the case here. New York Not–for–Profit Law provides that this Debtor can legitimately exist without such stockholders. N–PCL § 501. Notwithstanding the lack of shareholders, the beneficiaries of this corporation, i.e., children and adults learning of the Jewish religion, deserve to share the benefits of the net value of the corporate assets, if any. I specifically find that the lack of shareholders allows me, under the powers provided by 11 U.S.C. § 105(a) to direct the equity in corporate assets back into the Debtor corporation to be disposed of by the directors, in accordance with New York state law. Accordingly, should the proponent be willing to set aside a fund, or escrow account, in an amount equal to the value of the property transferred then the Court finds the remainder of the plan to be feasible. The Court finds that if either Summer Recreation or Spritzer is willing to escrow the sum of $1,375,200 with the Court, the modified plan can be confirmed as feasible. The proponent is given sixty (60) days to arrange such deposit with the Clerk.[11] Subject to claims litigation, the fund shall be disbursed to allowed claimants in the priority envisioned by the plan, with the balance, if any, paid over to the Debtor.

The Court directs the proponent to submit a proposed order confirming the plan as modified by this Opinion within five (5) business days.

An Order will follow.

### ORDER

For those reasons indicated in the Opinion filed this date, **IT IS HEREBY**

**ORDERED** that the Second Amended Plan filed by Yaakov Spritzer, as modified by Exhibit C, is confirmed contingent on a deposit with the Court of the fair market value of the property transferred in the amount of $1,375,200 within sixty (60) days. The said fund, subject to claims litigation, will be disbursed to allowed claimants in the priority and manner as envisioned by the plan, with the balance, if any, paid over to the Debtor.

### OPINION

On October 16, 2006, the Debtor, Machne Menachem, filed a Motion for

---

(2) earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of continuation of the same management; and (6) any [of] the related matters which determine the prospects of a sufficiently successful operations to enable performance of the provisions of the plan." *Id.* (citing *In re Calvanese,* 169 B.R. 104, 109 (Bankr.E.D.Pa.1994)), *see also* 7 Collier on Bankruptcy, ¶ 1129.03[11] *supra.*

11. Such sum can be modified as approved by the Court or as may be agreed between the purchaser, the Debtor, and particular claimants, also subject to Court approval.

"Clarification and/or Reconsideration" regarding the Court's confirmation of a plan advanced by proponent, Yaakov Spritzer. I will treat the Motion as presented under Federal Rule of Civil Procedure 59, incorporated into bankruptcy matters by Federal Rule of Bankruptcy Procedure 9023.

■ The Debtor attempts to advance several of the issues theretofore addressed at the confirmation hearing and at least one argument raised for the first time in its post-trial motion. Rule 59(e) cannot generally be used to raise arguments that were not raised at the initial hearing.

Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion. However, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly. There are four basic grounds upon which a Rule 59(e) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice. Serious misconduct of counsel may justify relief under this theory. Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law.

The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment. Also, amendment of the judgment will be denied if it would serve no useful purpose.

11 Charles Alan Wright, Arthur K. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2006)(footnotes omitted).

The Debtor, in its objection to the plan and at the time of the hearing on the plan, focused its argument on three prongs:

1. The Spritzer plan was contrary to New York law;
2. The plan was not feasible; and
3. The plan was not offered in good faith.

These issues were addressed in the confirmation Opinion. (Doc. # 594)

In its post-confirmation pleading, the Debtor advances the same arguments and supplements that argument by alluding, for the first time, to the basic unfairness in Spritzer's plan of deeming allowed, claims that were being challenged by the Debtor.

■ As indicated heretofore, motions under Rule 59 are granted for a variety of reasons, including newly discovered evidence, manifest errors of law or fact, to prevent manifest injustice, and an intervening change in controlling law.

There is no new evidence or change in law. If there are manifest errors of law or fact, they are not apparent to the Court.

The Debtor complains about Court-approved modifications subsequent to the confirmation hearing, but none appear to be of negative consequence to either the Debtor or the creditors. The Court approved (1) a credit to the purchase price of the undisputed first mortgage against the property conditioned on the Debtor being released from further liability on the mortgage and (2) the substitution of the theretofore appointed Chapter Eleven Trustee as the plan disbursement agent.

**EQUITABLE MOOTNESS**

Immediately after final confirmation, the real estate of the Debtor was transferred to a nonprofit corporation pursuant to the

confirmed plan and, contemporaneously with the transfer, monies were delivered to the Chapter Eleven Trustee as the disbursing agent. The Debtor sought no stay of the confirmation. Spritzer, the proponent, now argues that the doctrine of equitable mootness prevents this Court from according relief suggesting that the Debtor's Motion for Clarification and/or Reconsideration should, accordingly, be denied.

 "Under this widely recognized and accepted doctrine, the courts have held that '[a]n appeal should be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.' Citation omitted." *In re Continental Airlines,* 91 F.3d 553, 559 (C.A.3 (Del.) 1996).

Factors that have been considered by courts in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal include (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*In re Continental Airlines,* 91 F.3d 553, 560 (C.A.3 (Del.) 1996)

 The concept of equitable mootness has been applied to matters other than appeals when the subject matter has been confirmation of a plan of reorganization. *Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.),* 302 B.R. 136, 140–41 (Bankr.D.Del. 2003).

The first factor asks for a determination whether the plan has been "substantially consummated." This is a term of art defined in 11 U.S.C. § 1101(2) as

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C.A. § 1101

There is no disagreement that all tangible property of the Debtor has been transferred to a nonprofit corporation under the plan. Moreover, distribution to certain creditors has already taken place.

Since the Debtor was not the proponent of this liquidating plan, little remains for the Debtor post confirmation but the advancement of certain litigation and a continuation of their corporate purpose.

This factor weighs in favor of mootness.

The second factor asks whether a stay has been obtained. The answer is no. This, despite ample opportunity to do so. An appeal from the provisional confirmation order was filed as early as September 19, 2006, yet no stay was sought. A subsequent Order confirming the Modified Second Amended Plan was entered October 5, 2006. Debtor filed a Motion to Reconsider on October 16, 2006, yet still failed to seek a stay. An appeal was filed October 18, 2006, yet no stay was requested. It was not until the proponent, Yaakov Spritzer, filed a notice of substantial consummation on October 30, 2006, that the Debtor moved for a stay pending reconsideration.

The third factor, whether parties not before the Court would be affected by a successful motion to reconsider, does not appear to be a factor inasmuch as the purchaser is a principal creditor or his affiliate.

The fourth factor being whether a victory on appeal will affect the success of the plan certainly weighs in favor of mootness since the appeal asks that confirmation of the plan be denied.

The last factor advancing the public policy argument of attaching finality to bankruptcy judgments, may actually be the most compelling item on this issue. While the Debtor's case began five years ago, litigation amongst its principals languished in the New York courts for many years before that. While in bankruptcy, no less than two confirmation hearings were conducted resulting in extended appeals processes. Throughout the course of this controversy, the tension was not between creditor and Debtor but between rival factions fighting for control of the religious camp represented by the Debtor corporation. The confirmed plan had the effect of allowing the tangible camp property to change hands while permitting the current directors to retain control of the corporate organization. If any scenario presents a more compelling argument for advancing the finality of a court judgment, I have not been made aware of such case. This factor alone would be sufficient to allow me to conclude that equitable mootness should attach to this proceeding.

Notwithstanding this conclusion, there is a substantial argument, based on policy, why a bankruptcy judge should not entertain this doctrine with regard to a reconsideration motion. Appellate review by an Article III Judge is a fundamental pillar of our jurisdictional grant. It would be overreaching for a bankruptcy judge to conclude that the parties to a potential appeal have the tools to negate this fundamental right. See, for example, the concurring opinion of then Circuit Judge Alito in *Nordhoff Investments Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 182 (3d Cir.2001). For this reason, I decline to dispose of this Motion on mootness grounds, especially in light of the lack of substance advanced in furtherance of the Rule 59 motion. The Debtor has simply not raised any manifest error of law or fact or brought to my attention any new evidence. It appears that, if the Debtor would succeed on its Rule 59 motion, it would simply present additional "facts" that it overlooked at the initial hearing. As suggested earlier, these are insufficient grounds to grant a Rule 59 motion.

For these reasons, the Motion will be denied.

An Order shall follow.

### *ORDER*

For those reasons indicated in the Opinion filed this date, **IT IS HEREBY**

**ORDERED** that Debtor's Motion for Clarification and/or Reconsideration of Order Confirming the Modified Second Amended Plan of Reorganization dated December 19, 2005, filed by Yaakov Spritzer (Doc. # 626), is **DENIED.**